**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**HARTFORD DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | CASE NO.   21-20211 (JJT) |
| | ) | |
| CE ELECTRICAL CONTRACTORS, LLC, | ) | CHAPTER   11 |
| DEBTOR. | ) | |
| | ) | RE: ECF NO. 427 |

**MEMORANDUM OF DECISION RELATED TO PEOPLE'S UNITED BANK'S OBJECTION TO DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION**

People's United Bank, N.A. ("PUB") has objected to confirmation of the Fourth Amended Plan of Reorganization (the "Plan") filed by CE Electrical Contractors, LLC (the "Debtor"). ECF No. 427 (the "Objection"). In particular, PUB's Objection assails the Debtor's treatment of its claim under the Plan, as more particularly discussed herein.

I. **BACKGROUND**

The Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code on March 5, 2021 (ECF No. 1, the "Petition"). PUB is the Debtor's senior, fully secured lender, holding a first priority security interest in substantially all of the Debtor's assets, including its monies, receivables, inventory, machinery, and equipment.[1] PUB filed Proof of Claim No. 47 (the "Claim") on June 3, 2021 related to a $75,000 loan that PUB made to the Debtor, which was issued with a variable 5.25% interest rate. The total amount of the Claim is $80,756.58, which includes interest, legal fees, and other costs.[2] Attached to the Claim is a copy of the promissory note and security agreement evidencing the $75,000 loan from PUB to the Debtor, dated May 27, 2016 (the "Note"). The Debtor filed its Plan on February 10, 2022 (ECF No. 383), which contemplates impairing PUB's Claim in the following ways:

---

[1] According to the Debtor's Schedules, PUB is substantially over-secured.
[2] The amount of the Claim will also be supplemented by further allowance for legal fees as approved by this Court.

    a) converting PUB's Note from a demand note into a term loan;

    b) lowering the interest rate from a variable 5.25% rate with a 4% interest rate floor into a fixed rate of 4%;

    c) omitting an annual loan charge;

    d) waiving default interest; and,

    e) modifying the terms of a non-debtor guaranty.

PUB maintains that the Debtor did not make efforts to contact PUB and discuss its proposed treatment prior to filing the Plan. PUB voted to reject the Plan and filed its Objection on March 15, 2022. In PUB's assessment, the Plan cannot be confirmed because it fails to meet the "best interests of creditors" test and fails to meet the requirements under the cramdown provisions of the Bankruptcy Code because it unfairly discriminates against PUB and does not treat PUB's impaired class as fair and equitable. In an ostensible criticism of the Plan's lack of comparative fairness, PUB takes issue with the fact that Paul Calafiore ("Calafiore"), the Debtor's principal, will continue to be compensated at approximately $180,000 per year in salary while PUB, a fully secured senior creditor, and other creditors are impaired under the Plan.

PUB also objects to a provision in the Plan that provides for a temporary injunction in favor of Calafiore, who holds several personal guaranties in excess of $3 million on loans for the Debtor, on the basis that a third party injunction is unwarranted and unfairly prejudices PUB and other creditors.[3] Importantly, PUB has voted against confirmation of this Plan based upon its Objection.

---

[3] The Plan indicates that four creditors have sued Mr. Calafiore based on those personal guaranties. *See* Plan at 2–3. Those creditors are Capital Lighting & Supply, LLC, Consolidated Electrical Distributors, Inc., Global Merchant Cash, Inc., and Philadelphia Indemnity Insurance Company. The lawsuits are currently pending in four different states: Virginia, New York, Florida, and Pennsylvania.

## II. DISCUSSION

### A. The Third Party Injunction is Unwarranted

The Debtor's third party injunction benefitting Calafiore is unnecessary, unwarranted and unfairly prejudices PUB and other creditors. The Court has previously addressed whether it would endorse and otherwise issue the proposed temporary injunctions under the Fifth and Sixth Amended Plans of Reorganization. *See* Ruling on Req. for Injunctive Relief (ECF No. 453); Mem. of Decision on Chapter 11 Plan Injunction (ECF No. 455). This Court's prior decisions unequivocally reject the issuance of such an injunction on the merits, notwithstanding the Debtor's alternative reliance upon the Consenting Ballots that acknowledge that a confirmed plan might include such an injunction. This Court will not be confirming a Plan with such an injunction, whether temporary or permanent.

### B. Standard for Confirmation of a Chapter 11 Plan

The Court will now address the remainder of PUB's Objections under the standards for confirmation of a Chapter 11 plan set forth in Section 1129 of the Bankruptcy Code. "Succinctly stated, [a] plan may not be confirmed unless either (1) it is approved by two-thirds in amount and more than one half in number of each impaired class, 11 U.S.C. § 1126(c), 1129(a)(8); or (2) at least one impaired class approves the plan, § 1129(a)(10), and the debtor fulfills the cramdown requirements of § 1129(b) to enable confirmation notwithstanding the plan's rejection by one or more impaired classes." *In re 499 W. Warren St. Assocs., Ltd. P'ship*, 151 B.R. 307, 310 (Bankr. N.D.N.Y. 1992) (internal quotation marks omitted).

The plan proponent must prove by a preponderance of the evidence that the plan satisfies each element of § 1129(a) applicable to corporate debtors seeking to confirm a consensual plan of reorganization. *In re Ditech Holding Corp.*, 606 B.R. 544, 554 (Bankr. S.D.N.Y. 2019). If any

3

impaired class rejects the plan, it may still be confirmed over an objection if the plan satisfies the Bankruptcy Code's cramdown provisions under 11 U.S.C. § 1129(b). Under the Code's cramdown provisions, the plan proponent must show that all mandatory confirmation requirements have been satisfied, except for the requirement that all impaired classes have accepted the plan, 11 U.S.C. § 1129(a)(8); that the plan does not discriminate unfairly against any impaired, non-consenting class, *Mercury Cap. Corp. v. Milford Connecticut Assocs., L.P.*, 354 B.R. 1, 10 (D. Conn. 2006); and, that the plan is fair and equitable, *In re DBSD N. Am., Inc.*, 634 F.3d 79, 94 (2d Cir. 2011).

### C. The Debtor Cannot Achieve Confirmation of Its Plan Under 11 U.S.C. § 1129(a) Because the Plan Does Not Meet the Best Interests of Creditor's Test Under 11 U.S.C. § 1129(a)(7)

One of the most important aspects of plan confirmation is the "best interests of creditors" test found under 11 U.S.C. § 1129(a)(7)(A). "A Chapter 11 reorganization plan may not be confirmed unless it satisfies . . . the 'best interests of creditors' test." *In re Wireless Data, Inc.*, 547 F.3d 484, 495 (2d Cir. 2008); *see also* 11 U.S.C. § 1129(a)(7)(A); *In re Ditech*, 606 B.R. at 606. Section 1129(a)(7) of the Bankruptcy Code provides that each impaired class must either accept the plan or "receive or retain under the plan on account of such claim or interest property of value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated." 11 U.S.C. § 1129(a)(7)(A); *see also In re Wireless Data*, 547 F.3d at 495 (holder of impaired claim must either accept plan or receive amount not less than it would receive in Chapter 7 liquidation). Thus, the test "focuses on individual creditors rather than classes of claims." *In re Ditech*, 606 B.R. at 606 (internal quotation marks omitted).

4

PUB contends that the Debtor's Plan does not meet the "best interests of creditor's" test because the Plan does not provide PUB with more than it would receive in a Chapter 7 liquidation by depriving it of fees, interest, attorney's fees, and costs of collection. As a fully secured creditor, PUB would receive the full value of its secured claim upon liquidation of the collateral in a Chapter 7 proceeding and, therefore, must receive the full value of its secured claim under the Plan. In its current form, the Plan proposes to pay PUB less than the full value of its Claim by modifying the terms of the Note, which includes eliminating accrued default interest, and eliminating an annual loan charge. Accordingly, the Plan does not meet the "best interests of creditors" test as it applies to PUB.

### D. The Debtor Cannot Cramdown the Plan Under 11 U.S.C. § 1129(b)

The Plan impairs PUB's Claim and classifies it as the sole member in Class 1. Because PUB, an impaired class, has voted to reject the Plan, the Debtor is unable to achieve consensual confirmation of its Plan under § 1129(a)(8), which provides that each impaired class must accept the plan. Accordingly, confirmation of the Debtor's Plan can only be achieved under the cramdown provisions of the Code found in § 1129(b). If all requirements of § 1129(a) are met, excluding the requirement under § 1129(a)(8), the Court must confirm the Plan under § 1129(b) if it does not discriminate unfairly and is fair and equitable with respect to each impaired class which has not accepted the plan. 11 U.S.C. § 1129(b)(1).

PUB argues that the Debtor cannot succeed under the cramdown provisions of the Bankruptcy Code because the Plan unfairly discriminates against PUB and does not treat its impaired class as fair and equitable by proposing to modify the terms of its Note. The Court agrees.

### 1. The Plan Unfairly Discriminates Against PUB

Without a definition of "unfair discrimination" under the Bankruptcy Code, "[c]ourts have struggled to give the unfair discrimination test an objective standard." 7 Collier on Bankruptcy ¶ 1129.03 (16th ed. 2022). Although courts have developed tests that tend to vary across jurisdictions, the prevailing view is that "the purpose of the requirement is to ensure that a dissenting class will receive relative value equal to the value given to all other similarly situated classes." *In re LightSquared, Inc.*, 513 B.R. 56, 99 (Bankr. S.D.N.Y. 2014); *accord In re Sun Edison, Inc.*, 575 B.R. 220, 226 (Bankr. S.D.N.Y. 2017); *In re 20 Bayard Views, LLC*, 445 B.R. 83, 104 (Bankr. E.D.N.Y. 2011); *In re Johns-Mansville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986, *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd*, 843 F.2d 636 (2d Cir. 1988).

One such test is the "Markell test," formulated in an article by Bruce A. Markell, *A New Perspective on Unfair Discrimination in Chapter 11*, 72 Am. Bankr. L. J. 227 (1998), and generally followed by courts in the Sixth Circuit. Under this approach, "a rebuttable presumption that a plan is unfairly discriminatory will arise when there is:

> (1) [A] dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution."

*In re Dow Corning Corp.*, 244 B.R. 705, 710 (Bankr. E.D. Mich. 1999), *aff'd*, 255 B.R. 445 (E.D. Mich. 2000), *aff'd and remanded*, 280 F.3d 648 (6th Cir. 2002). The plan proponent has "the burden of showing by a preponderance of the evidence that all requirements of § 1129(b)(1) have been satisfied." *Id.*

PUB alleges that the Plan unfairly discriminates against PUB because it impairs PUB as the sole member of Class 1 while the junior secured creditors in Classes 3 through 7 receive more favorable treatment. The Court agrees.

Here, the first factor of the "Markell test" is satisfied by the fact that PUB voted to reject the Plan. As for the second factor, PUB points to Classes 3 through 7, which relate to commercial vehicle financing and provide for treatment of allowed secured claims for Ford Motor Credit Company ("Ford Credit") and Americredit Financial Services, Inc. ("Americredit").[4] The third factor is met by virtue of the Plan's disparate treatment of Classes 3 through 7 and the allocation of a materially greater risk to PUB in connection with its proposed distribution. Ford Credit's claim is secured by an F-150 truck and Americredit's claims are secured by four Chevy Silverado trucks. The Plan proposes paying each of these Classes, including PUB, in full. The only difference is the length of time over which payments are to be extended. PUB's Claim will be amortized over six years at the appropriate cramdown rate of interest.[5] In contrast, Class 3, containing Ford Credit's Claim, is unimpaired and will be paid in full at its contractual rate. Americredit's claims in Classes 4 through 7 will be paid in full at their contractual rates and are impaired only to the extent that the Plan extends the payment term of each financing agreement by six months.

The difference in treatment between PUB, Ford Credit and Americredit does not necessarily result in "a materially lower percentage recovery" for PUB in the sense that PUB will still be paid the full balance of its Claim. But the other modifications contemplated by the Plan, which involve a reduction in the interest rate, as well as elimination of default interest and an

---

[4] Barring some minor disputes about differences in the payoff amounts of certain secured claims, none of the secured creditors aside from PUB objected to the provisions of the Plan at issue here.

[5] The Court addresses the appropriate cramdown rate of interest later in this opinion under the "fair and equitable" requirement.

annual loan charge, treat PUB in an unfair manner compared to the other classes of secured creditors. By amortizing PUB's Claim over six years, the Plan also places an allocation of materially greater risk on PUB. If the Debtor is not able to comply with the terms of the Plan, once confirmed, and meet its Plan payment obligations, PUB will shoulder a much greater risk of losing the net present value of its Claim than either Ford Credit or Americredit. These reasons support the third factor of the Markell test and, all together, trigger a rebuttable presumption that the Plan unfairly discriminates against PUB. *Cf. In re Dow Corning Corp.*, 244 B.R. at 711 (plan did not unfairly discriminate between classes of similarly situated claims because the dissenting class potentially could receive higher settlement amount than other similarly situated classes in event it chose litigation of its claim related to unpaid medical bills). Thus, the Plan in its current form cannot be confirmed in this regard.[6]

## 2. The Plan Does Not Treat PUB Fairly and Equitably

The Plan proposes to extend the payment term on PUB's Note while decreasing its interest rate, waiving default interest, omitting an annual loan charge, and modifying Calafiore's non-debtor personal guaranty. PUB alleges that the Plan is not fair and equitable under § 1129(b)(2) because the Plan, on its face, proposes to pay PUB less than the current value of its Claim.

---

[6] In its Memorandum in Support of Confirmation, the Debtor relies on a slightly different variation of the unfair discrimination test from an earlier case in the Eastern District of Michigan: *In re Graphic Commc'ns., Inc.*, 200 B.R. 143, 148 (Bankr. E. D. Mich. 1996). In *In re Graphic*, the court used a four-factor test to determine whether a dissenting creditor was being treated unfairly, which factors included (1) "whether the discriminating treatment is reasonable;" (2) "whether the debtor could carry out a plan that does not so discriminate;" (3) "whether the plan containing the discriminating treatment is proposed in good faith;" and (4) "the actual treatment of the discriminated class." *Id.* Whether the Court applies the "Markell test" from *In re Dow Corning* or the Debtor's chosen test from *In re Graphic*, however, the result is the same. The Court disagrees with the Debtor's contentions that the modifications to PUB's Note are so small as to constitute slight discrimination that could be considered fair.

When a dissenting class of secured claims has voted to reject the plan, Section 1129(b)(2)(A) of the Bankruptcy Code requires that a plan be "fair and equitable." This means that each secured creditor either:

(i) Retains the lien securing its claim and receives deferred cash payments totaling at least the allowed amount of its secured claim, § 1129(b)(2)(A)(i);

(ii) Receives the "indubitable equivalent" of the value of its claim, § 1129(b)(2)(A)(ii); or

(iii) Receives a lien on the proceeds of a sale of its collateral (free and clear of its lien) subject to its right to purchase the property by credit bidding its secured claim against the purchase price under § 363k of the Bankruptcy Code, § 1129(b)(2(A)(iii).

11 U.S.C. § 1129(b)(2)(A).

The Bankruptcy Code does not define "indubitable equivalent," but most courts have interpreted the phrase in a straightforward manner to mean "the unquestionable value of a lender's secured interest in the collateral." *In re Philadelphia Newspapers, LLC*, 599 F.3d 298, 310 (3d Cir. 2010), *as amended* (May 7, 2010); *accord In re Arnold & Baker Farms*, 85 F.3d 1415, 1421 (9th Cir. 1996) (the Code does not require that a creditor receive the "indubitable equivalent" of its entire claim, but only of its secured claim, and the value of the secured portion is by definition the value of the collateral securing it); *In re Bate Land & Timber LLC*, 877 F.3d 188, 192 (4th Cir. 2017) ("indubitable equivalent" means the value of a creditor's secured portion of its claim); *see, e.g.*, *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 644–47 (2012) (debtors could not sell property free and clear of liens without allowing lienholders to credit-bid because cash generated by auction alone was not enough to provide secured creditors with the indubitable equivalent of their claims); *In re Lightsquared Inc.*, 513 B.R. 56 (Bankr S.D.N.Y. 2014) (note secured by third priority lien on existing and new collateral did not provide secured creditor with indubitable equivalent of its claim when parties seriously

disagreed as to valuation and regulatory hurdles); *In re DBSD N. Am., Inc.,* 419 B.R. 179 (Bankr. S.D.N.Y. 2009) (amended loan facility secured by first lien on substantially all of debtor's assets provided first-lien creditor with indubitable equivalent of its claim despite eliminating or loosening certain covenants).

        **i.**    **The Appropriate Cramdown Rate of Interest Under *Till* and *MPM Silicones***

When a plan contemplates providing a secured creditor with a replacement lien, the "fair and equitable" test often implicates what the appropriate cramdown rate of interest should be. *See Till v. SCS Credit Corp.*, 541 U.S. 465, 479–80 (2004); *Matter of MPM Silicones, L.L.C.*, 874 F.3d 787 (2d Cir. 2017). Under the facts and circumstances of this case, the issue for the Court to decide is what the appropriate Chapter 11 cramdown rate of interest should be for PUB's replacement lien. The original Note calls for a rate of interest of prime plus 2 with a 4% floor. The Debtor's Plan calls for a 4% fixed rate, but PUB contends that it is entitled to a floating prime rate, plus 4 with a 4% floor.

Although the Bankruptcy Code provides for cramdown, it does not disclose a formula by which to calculate the interest rate that the debtor should pay the secured creditor on its replacement lien. *See* 11 U.S.C. § 1129(b). In *Till v. SCS Credit Corp.*, 541 U.S. 465, 479–80 (2004), the Supreme Court issued a plurality opinion in which Justice Stevens held that the "formula approach" was the appropriate method by which to calculate the cramdown interest rate in a Chapter 13 case. The formula approach "begins by looking to the national prime rate, reported daily in the press, which reflects the financial market's estimate of the amount a commercial bank should charge a creditworthy commercial borrower to compensate for the opportunity costs of the loan, the risk of inflation, and the relatively slight risk of default," which

is then accompanied by an appropriate risk adjustment to the prime rate. *Id.* at 479. The Court, however, did not determine the proper scale for the risk adjustment. *Id.*[7]

In *Matter of MPM Silicones, L.L.C.*, 874 F.3d 787 (2d Cir. 2017), the Second Circuit confronted the issue of whether Justice Steven's formula approach in *Till* should apply equally in a Chapter 11 case. The Second Circuit adopted the same two-part test endorsed by the Sixth Circuit in *In re American HomePatient, Inc.*, 420 F.3d 559 (6th Cir. 2005). Under the test,

> "[T]he market rate should be applied in Chapter 11 cases where there exists an efficient market. But where no efficient market exists for a Chapter 11 debtor, then the bankruptcy court should employ the formula approach endorsed by the *Till* plurality.

*MPM Silicones*, 874 F.3d at 800 (quoting *American HomePatient*, 420 F.3d at 568). "In applying this rule, courts have held that markets for financing are 'efficient' where, for example, 'they offer a loan with a term, size, and collateral comparable to the forced loan contemplated under the cramdown plan." *Id.* (quoting *In re Texas Grand Prairie Hotel Realty, L.L.C.*, 710 F.3d 324, 337 (5th Cir. 2013)).[8]

The parties agree that there is no efficient market for the Debtor in this case. In its Memorandum in Support of Confirmation, the Debtor provided a list of reasons as to why lenders will not lend money to the Debtor.[9] At a hearing held on March 30, 2022, PUB conceded

---

[7] In dictum, the Court suggested that, when choosing the cramdown rate of interest in a Chapter 11 case, "it might make sense to ask what rate an efficient market would produce" as opposed to relying on the prime rate plus a risk adjustment as a primary solution. *Till*, 541 U.S. at 476 n.14.

[8] The Court in *MPM Silicones* explained that it "[did] not read the *Till* plurality as stating that efficient market rates are irrelevant in determining value in the Chapter 11 cramdown context. And, disregarding available efficient market rates would be a major departure from long-standing precedent dictating that 'the best way to determine value is exposure to a market.'" *MPM Silicones*, 874 F.3d at 800 (quoting *Bank of Am. Nat'l Trust and Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999)).

[9] The Debtor's reasons as to why there is no efficient market are as follows: the Debtor has no security to offer, as its assets are fully encumbered; the Debtor cannot sell its assets, as its assets are fully encumbered; the Debtor owes approximately $1.2 million to various lenders at present; the Debtor's anticipated total income is only about twice its current debt load, which makes it an unattractive borrower; Calafiore, the Debtor's principal, is exposed to approximately $3 million in personal guaranties and is the target of four lawsuits in different states; the Debtor's net cash flow during the Plan term, after Plan payments, will be sufficient for operating needs but not for a new lender;

11

that it could not meet its burden to establish an efficient market rate and, thus, the Court should apply the formula approach under *Till*. Accordingly, consistent with the authority cited above, the Court finds that the appropriate rate of interest as of the effective date of the Plan shall be denominated at the current, fixed prime rate plus 2 so as to reflect the market cost of funds and risk adjust the restructured loan, which is otherwise fully secured. *See In re Valenti*, 105 F.3d 55, 64 (2d Cir. 1997) (a risk adjustment premium from 1% to 3% is used to determine a fair rate of interest), *abrogated on other grounds by Assocs. Com. Corp. v. Rash*, 520 U.S. 953 (1997); *In re Velez*, 431 B.R. 567, 571 (Bankr. S.D.N.Y. 2010); *In re Martinez*, 409 B.R. 35, 41 (Bankr. S.D.N.Y. 2009).

### ii. The Plan's Remaining Proposed Modifications of PUB's Note Are Unfair and Inequitable

Aside from adjustment of the cramdown interest rate, PUB also objects to the provisions in the Plan that seek to modify the terms of the Note, which include converting PUB's demand Note to a term note, eliminating an annual loan charge, waiving default interest, and modifying the terms of Calafiore's non-debtor guaranty. The Debtor claims that these are reasonably small modifications to PUB's Note that do not treat PUB unfairly. Although the parties sparingly briefed these issues, the Court will address each in turn.

The only proposed modification of Mr. Calafiore's non-debtor personal guaranty in the Plan that the Court can discern is the temporary injunction prohibiting certain creditors from pursuing debt collection actions against Mr. Calafiore in various state courts. The parties did not elaborate beyond this aspect either in their briefs or during the hearing. As previously stated, this Court has already ruled against imposition of that injunction. *See* Ruling on Req. for Injunctive

---

the Debtor is not the type of large company that lenders consider a desirable borrower; and, the Debtor defaulted on pre-bankruptcy debt. Debtor's Mem. in Supp. of Confirmation, ECF No. 433.

Relief (ECF No. 453); Mem. of Decision on Chapter 11 Plan Injunction (ECF No. 455). The Debtor has not presented the Court with any additional authority for modifying the terms of that guaranty beyond the authority already considered by this Court in its prior rulings concerning the temporary injunction. Further, the Court's jurisdiction to so modify or reform the terms thereof may be suspect. This modification is probably unfair where efforts to effectuate a consensual modification of the guaranty or payments thereunder appear to have not been pursued and where the guarantor remains vulnerable to his own bankruptcy related to other corporate indebtedness in excess of $3 million. As such, the Court hereby declines to modify the terms of Calafiore's non-debtor guaranty.

The parties' contentions as to the Plan's remaining proposed modifications broadly raise the issue of whether shifting the risk related to the operations and financial performance of a debtor by modifying covenants and other terms in the prepetition loan documents is unfair and unreasonable. *See* 7 Collier on Bankruptcy ¶ 1129.03 (16th ed. 2022). In general, the Bankruptcy Code provides that a Chapter 11 plan may "modify the rights of holders of secured claims." 11 U.S.C. § 1123(b)(5); *see also In re Ocean View Motel, LLC*, No. 20-21165-ABA, 2022 WL 243213, at *3 (Bankr. D.N.J. Jan. 25, 2022) (collecting cases). An important question to consider is whether any of the proposed modifications of loan terms or covenants would threaten feasibility if included in the postpetition loan documents. The fact that a proposed modification supports feasibility of the plan is one factor that may support a finding that the plan is fair and equitable. *See id.*

First, the Court finds that PUB's Note may be fairly and properly converted from a demand note to a term note. Affording PUB a postpetition demand note potentially threatens feasibility in the event that PUB calls the note and demands that the balance and any accrued

interest be paid in full. Although the current balance of PUB's Note, exclusive of interest, fees, and costs, is barely above $80,000, the Debtor's reorganization efforts would be seriously threatened if it were forced to pay the entire balance at once. *See id.* (eliminating deed in lieu of foreclosure provision contributed to feasibility because it prevented liquidation or further need for reorganization from occurring after confirmation).

Second, the Court declines to approve the elimination of the annual loan charge, particularly in light of the enhanced administrative tasks inherent in monitoring the restructured term note. The Note imposes a non-refundable annual fee of $250, which may be changed at PUB's discretion subject to applicable law. *See* Claim No. 47 and attached Note. The fragile feasibility of the Debtor's Plan justifies PUB's monitoring of the Debtor's business performance and fulfillment of the Plan's promises, which makes the annual loan charge reasonable under those circumstances.

Finally, the Court declines to waive the contractual default rate in the Note or to waive any accrued default interest, but will equitably adjust the default rate as set forth below.[10] The Bankruptcy Code generally provides for three categories of interest: "(1) interest accrued prior to the filing of the bankruptcy petition (prepetition interest); (2) interest accrued after the filing of a petition but prior to the effective date of a reorganization plan (pendency interest); and (3) interest to accrue under the terms of a reorganization plan (plan interest)." *In re Milham*, 141 F.3d 420, 423 (2d Cir. 1998). "Prepetition interest is generally allowable to the extent and at the rate permitted under the applicable nonbankruptcy law, including the law of contracts." *Id.* "An event of default or the maturity of the debt will often trigger a higher interest rate, and '[i]t is

---

[10] The Note calls for a special interest rate that applies upon default, which must be calculated at the time of default based on the variable interest rate at that time. *See* Claim No. 47 and attached Note. The default interest rate is measured by adding an additional 5,000 percentage point margin to the Note's variable interest rate. *Id.*

well settled that an agreement to pay interest at a higher rate in the event of default or maturity is an agreement to pay interest and not a penalty.'" *In re 785 Partners LLC*, 470 B.R. 126, 131 (Bankr. S.D.N.Y. 2012). "A higher default interest rate reflects the allocation of risk as part of the bargain struck between the parties, a bargain that benefits the obligor as well as the obligee." *Id.* (citing *Ruskin v. Griffiths*, 269 F.2d 827 (2d Cir. 1959). "Even where the default rate strikes the judge as high, a court cannot rewrite the parties' bargain based on its own notions of fairness and equity." *Id.* (citing *Cruden v. Bank of N.Y.*, 957 F.2d 961, 976 (2d Cir. 1992) and collecting cases).

The Second Circuit has not specifically addressed a secured creditor's entitlement to default interest in the context of the Bankruptcy Code's provisions for curing and waiving any default, *see* 11 U.S.C. § 1123(a)(5)(G) and (d), but other courts have upheld a secured creditor's right to default interest under those provisions. *See, e.g., In re New Investments, Inc,* 840 F.3d 1137, 1140 (9th Cir. 2016) ("[A] debtor cannot nullify a preexisting obligation in a loan agreement to pay post-default interest solely by proposing a cure.").

Some courts in the Second Circuit have considered whether a bankruptcy court may equitably reduce the contractual default rate of interest when faced with allegations that the secured creditor has engaged in misconduct or the default rate constitutes a penalty. *See, e.g., In re 1111 Myrtle Ave. Grp., LLC*, 598 B.R. 729, 740 (Bankr. S.D.N.Y. 2019) (equitable reduction of default rate should be limited to extreme situations where secured creditor is guilty of misconduct, default rate would harm unsecured creditors, or default rate would impair debtor's fresh start). In those cases, "[t]he debtor bears the burden of rebutting the presumption that the contract rate of interest applies post-petition." *Id.* The Debtor has not made any of these

15

arguments here and has presented neither evidence nor legal authority to rebut such a presumption.

Without further proof or briefing from the Debtor, the Court declines to waive any accrued default interest but equitably reduces the default rate prospectively postconfirmation to 10% per annum. *See In re 785 Partners LLC*, 470 B.R. at 132 (declining to adjust default rate because debtor and creditor were sophisticated parties represented by counsel who voluntarily agreed to allocate risk of default by including 5% default interest rate); *1111 Myrtle Ave.*, 598 B.R. at 742 (under New York Law, default interest rate of 7% above the contractual non-default rate was not a penalty); *see also In re DBSD N. Am., Inc.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009) (chapter 11 plan that eliminated or loosened certain covenants and included less restrictive cross-default provisions provided secured creditor with indubitable equivalent of its claim), *aff'd*, 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010), *aff'd in part, rev'd in part*, 627 F.3d 496 (2d Cir. 2010). In the end, the existence of a reasonable prospective default rate offers an additional risk adjustment to PUB if a default arises within the Debtor's fragile Plan feasibility. Such a provision also serves to incentivize the Debtor to avoid defaulting. Under the facts and circumstances here, the rebalancing of these terms, as considered by the Court, would be fair and equitable.

### III.    THE COURT'S DISPOSITION AND ORDER

Accordingly, consistent with the above authority and notions of fundamental fairness, the Court finds:

1)    That PUB's Note may be properly converted from a demand note to a six-year term loan;

2) That the cramdown interest rate as of the effective date of the Plan shall be denominated as the current, fixed prime rate plus 2 so as to reflect the market cost of funds with an appropriate risk adjustment for the restructured loan, which is otherwise fully secured;

3) That PUB's postpetition loan shall include the annual loan charge, particularly in light of the enhanced administrative oversight inherent in monitoring the restructured Debtor;

4) That any accrued default interest will not be waived but the default rate of the Note will be equitably reduced prospectively postconfirmation to 10% per annum; and,

5) That the terms of the non-debtor guaranty will not be modified.

Absent revisions of the Plan consistent with the above, the Debtor cannot meet the "best interests" test or otherwise achieve a cramdown of the proposed Plan.

**IT IS SO ADJUDGED, ORDERED AND DECREED** at Hartford, Connecticut this 4th day of May 2022.

*James J. Tancredi*
United States Bankruptcy Judge
District of Connecticut